Entered: June 19th, 2018
Signed: June 19th, 2018



MICHELLE M. HARNER
U.S. BANKRUPTCY JUDGE

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Damond and Sharae Durant, | * | Case No. 17-20232-MMH |
| | * | |
| Debtors. | * | Chapter 7 |
| | * | |

* * * * * * * * * * * * *

**MEMORANDUM OPINION REGARDING THE MOTION OF THE UNITED STATES TRUSTEE FOR PARTIAL SUMMARY JUDGMENT**

This matter presents what would appear to be a relatively simple question—i.e., what qualifies as a "consumer debt" under the U.S. Bankruptcy Code.[1] But appearances can be deceiving. The Code defines a consumer debt as one incurred for a personal, family, or household purpose. 11 U.S.C. § 101(8). The purpose of the debt is the critical inquiry. The debt at issue in this matter is multi-faceted and, as such, has potentially more than one purpose. It arises both from use of certain specified funds by one of the above-captioned Debtors, as well as from a state court judgment imposing actual damages, non-economic damages, and punitive damages. As more fully explained below, based on a review of the relevant facts and applicable law, the Court concludes that a portion of the subject debt qualifies as a consumer debt for purposes of sections 101(8) and 707(b) of the Code. The Court does not determine whether this conclusion requires the dismissal or, with the Debtors' consent, conversion of the Debtors'

[1] 11 U.S.C. §§ 101 et seq. (the "Code").

chapter 7 case under section 707(b). That determination must await additional briefing and action by the parties.

## I. Relevant Background

Damond Durant, Sr. (the "Debtor") and Sharae Durant (collectively with the Debtor, the "Debtors") filed this chapter 7 case on July 28, 2017. The Debtors list approximately $452,146.00 in debt on the schedules to their chapter 7 petition. The overwhelming majority of this debt relates to a single judgment entered against the Debtor by the Circuit Court for Baltimore City on April 12, 2016 (the "State Court Judgment"). *See* Ex. 2, Mot. Part. Summ. J., ECF 29-2. The State Court Judgment is based on the Debtor's conduct with respect to certain inheritance funds in the amount of $75,803.83 (the "Inheritance Funds") belonging to the Debtor's son, Damon Durant, Jr. (the "Creditor"). *See id.*; *see also* Transcript of Feb. 17, 2016 State Court Hearing ("State Court Tr.") 36–41.[2]

The Creditor's late grandmother left him the Inheritance Funds in her Last Will and Testament (the "Will"). *See* Mot. Part. Summ. J. at 3, ECF 29. Under the terms of the Will, the Debtor was given custody of the Inheritance Funds because the Creditor was still a minor at the time. *Id.* When the Creditor turned 21 years old, the Debtor gave him $100.00. *Id*. According to the Creditor, the Debtor told him that the remainder of the Inheritance Funds was gone and that he should do whatever he needed to do. *Id.*; State Court Tr. 19–20.

---

[2] The United States Trustee attached only the State Court Judgment to the Motion for Partial Summary Judgment, but the transcript of the state court hearing and the judge's oral ruling, which resulted in the State Court Judgment, are integral to that judgment. In fact, the State Court Judgment provides, "For the reasons set forth on the record in open court, it is this 17th day of February 2016, ORDERED …." Ex. 2, Mot. Part. Summ. J., ECF 29. A copy of the February 17, 2016 transcript is attached as an exhibit to a separate Amended Motion for Summary Judgment filed by the Creditor in an adversary proceeding in this chapter 7 case pending against the Debtor. *See* Ex. A, Am. Mot. Summ. J., Adv. Pro. 17-00350 ("Durant Mot. Summ J."), ECF 24-3. Although the Court believes that the facts set forth in the United States Trustee's Motion for Partial Summary Judgment and the related exhibits are more than adequate to support the Court's findings herein, it takes judicial notice of the related state court transcript and, where appropriate or useful, references portions of the transcript in this Order. *See, e.g.*, *King v. Nalley*, 2017 WL 4221062, *2 (D. Md. Sept. 21, 2017) (taking judicial notice of official transcripts from *voir dire* proceedings and separate criminal case and citing relevant Fourth Circuit authority on issue).

The Creditor initiated litigation against the Debtor in the Circuit Court for Baltimore City (the "State Court") on January 16, 2015. The Creditor's complaint against the Debtor contained four counts sounding in fraud/intentional theft, breach of fiduciary duties, conversion, and unjust enrichment. *See* Ex. 2, Mot. Part. Summ. J., ECF 29-2. The complaint sought actual damages, attorneys' fees, and other appropriate relief. *Id.* The State Court's docket indicates that the Writ of Summons was served on the Debtor on March 19, 2015, but that no Answer or other response was filed by the Debtor.[3] *See* Ex. F, Durant Mot. Summ. J., ECF 24-7. Accordingly, the State Court entered a default judgment against the Debtor on September 29, 2015. *See id.*

The State Court then held an evidentiary hearing on damages relating to the default judgment. Only the Creditor and his counsel appeared at the damages hearing. *See* State Court Tr. 37. The State Court proceeded to hear evidence on the damages request, including the Creditor's testimony. The Creditor testified that the Debtor would not allow him to use any of the Inheritance Funds until he turned 21 years old, but then when he requested the money, the Debtor told him that all of the money was gone. *See id.* at 14–16, 18–20. Although the Creditor testified that he did not know what happened to the money, he observed certain changes in the Debtor's spending habits, including the purchase of a motorcycle shortly after the Debtor received the Inheritance Funds, and various vacations that the Debtor and his wife took after that time. *See id.* The State Court made several findings and observations in connection with that matter, including:

- "[The Debtor] has failed to appear having been given notice of today's hearing, having failed to respond to any process or notices from this Court." *Id.* at 37.

[3] The Court may take judicial notice of court dockets in other proceedings, including state court proceedings. *See, e.g.*, *Bey v. Shapiro Brown & Alt, LLP*, 997 F. Supp. 2d 310, 312 n. 1 (D. Md. 2014), *aff'd*, 584 F. Appx. 135 (4th Cir. 2014); *see also Strickland-Lucas v. Citibank, N.A.*, 256 F. Supp.3d 616, 620 n. 3 (D. Md. 2017) (explaining judicial notice generally, including judicial notice of docket entries).

- "I've looked at the conduct of [the Debtor] and I find it to be, as I said at the outset, aside from being heartbreaking to hear that somebody's been treated like this, it's reprehensible." *Id.* at 39.

- "The fact that [the Debtor] made repeated statements to [the Creditor] knowing full well that they were false, that he couldn't touch the money while he was spending it on himself, to me, clearly shows, by clear and convincing evidence, that there was actual malice, that [the Debtor] knew exactly what he was doing." *Id*.

After a full review of the record, the State Court entered the State Court Judgment, awarding the Creditor $75,804.83 in actual damages ("Actual Damages"), $70,000.00 in non-economic damages ("Non-Economic Damages"), and $227,414.49 in punitive damages ("Punitive Damages"). *See* Ex. 2, Mot. Part. Summ. J., ECF 29-2.

The United States Trustee ("U.S. Trustee") filed a Motion to Dismiss Case ("Motion to Dismiss") on November 6, 2017. ECF 18. The Motion to Dismiss asserts various grounds for dismissal of the Debtors' chapter 7 case under section 707(b) of the Code. The Creditor has joined the U.S. Trustee's Motion to Dismiss. ECF 20. The Debtors then filed an amended chapter 7 petition, changing the designation of their debt to primarily "non-consumer" debt, and a response to the Motion to Dismiss. ECF 23, 24.

The matter before the Court is the U.S. Trustee's Motion for Partial Summary Judgment that Debtor, Damon Durant's Debts are "Primarily Consumer Debt" ("Motion for Partial Summary Judgment"). ECF 29. The Motion for Partial Summary Judgment relates to the Motion to Dismiss. The U.S. Trustee filed a Memorandum in Support of the Motion to Dismiss, as well as a Request for Admissions of Fact (the "Requests for Admissions"), which the Court granted. ECF 28, 30, 34. The Debtor filed a response to the Motion for Partial Summary Judgment, and the Court held a hearing on the Motion for Partial Summary Judgment and the related pleadings on April 26, 2018 (the "Hearing"). ECF 32.

## II. Jurisdiction and Legal Standards

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Local Rule 402 of the United States District Court for the District of Maryland. This matter is a "core proceeding" under 28 U.S.C. § 157(b)(2).

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this contested matter by Bankruptcy Rule 7056, governs the Motion for Partial Summary Judgment. A moving party may be entitled to judgment as a matter of law under Civil Rule 56 in the absence of any genuine issue of material fact. Fed. R. Civ. P. 56. *See Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). *See also Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing standards for summary judgment). "When a party has submitted sufficient evidence to support its request for summary judgment, the burden shifts to the nonmoving party to show that there are genuine issues of material fact." *Emmett*, 532 F.3d at 297. Courts generally will grant summary judgment "unless a reasonable jury could return a verdict for the nonmoving party on the evidence presented." *Stanley Martin Cos. v. Universal Forest Prods. Schoffner LLC*, 396 F. Supp. 2d 606, 614 (D. Md. 2005) (citations omitted).

A court must view the evidence on summary judgment in the light most favorable to the nonmoving party and "draw all justifiable inferences" in its favor, "including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991) (citations omitted). Under Civil Rule 56, a party may support assertions made in a motion for summary judgment by citing to particular parts of materials in the record, including depositions, documents, electronically stored information,

affidavits or declarations, stipulations, admissions, interrogatory answers or other materials.[4] Fed. R. Civ. P. 56(c). A court has some flexibility in the kinds of evidence that it can consider in resolving a motion for summary judgment. *See, e.g.*, *Humphreys & Partners Architects*, 790 F.3d 532, 538–539 (4th Cir. 2015).

The Court notes that the material facts in this contested matter are not disputed for purposes of the Motion for Partial Summary Judgment. *See* Mot. Part. Summ. J., ECF 29; Response to Mot. Part. Summ. J., ECF 32; Order, ECF 30. Rather, the dispute concerns the application of sections 101(8) and 707(b) and relevant case law to those facts. Accordingly, the resolution of the legal issue presented by the Motion for Partial Summary Judgment is appropriate and warranted under Civil Rule 56.[5]

## III. Analysis

Section 707(b) provides, in relevant part, that "[a]fter notice and a hearing, the court, on its own motion or on a motion by the United States trustee, trustee (or bankruptcy administrator, if any), or any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such a case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter." 11 U.S.C. § 707(b)(1). A court analyzing a motion to dismiss under section 707(b)(1) must consider whether the petition was filed in bad faith or whether the totality of the circumstances suggests that the filing is abusive. 11 U.S.C. § 707(b)(3); *see also McGinnis v. Phillips (In re Phillips)*, 573 B.R. 626, 636 (Bankr. E.D. N.C.

---

[4] The U.S. Trustee attached the Complaint filed in the State Court, the State Court Judgment, and the Request for Admissions in support of the Motion for Partial Summary Judgment. In addition, the Court takes judicial notice of, and references where appropriate or useful, certain other materials. *See supra* notes 2 and 3 and accompanying text.

[5] Some courts have opined that the determination of whether a debt is consumer debt under section 101(8) of the Code is a question of fact. *See, e.g.*, *James v. West (In re West)*, 2017 WL 746250, at *7 (Bankr. W.D. Mo. Feb. 24, 2017). The Court agrees with this assessment in most instances, particularly where the debtor's purpose in incurring the debt is disputed. Here, the parties do not dispute how the Debtor used the Inheritance Funds. Rather, they disagree about the consequences of the Debtor's conduct and the subsequent judgment under applicable law.

2017) (explaining totality of the circumstances test invoked by courts in this Circuit). Before conducting any such analysis, however, a court must confirm that the debtor's debts are "primarily consumer debts." 11 U.S.C. § 707(b)(1).

Section 101(8) of the Code defines "consumer debt" to mean a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). The United States Court of Appeals for the Fourth Circuit has explained that a debt is a consumer debt if the "debt was not incurred with a profit motive or in connection with a business transaction." *Kestell v. Kestell (In re Kestell)*, 99 F.3d 146, 149 (4th Cir. 1996); *Cypher Chiropractic Ctr. v. Runski (In re Runski)*, 102 F.3d 744, 747 (4th Cir. 1996) ("And, courts have concluded uniformly that debt incurred for a business venture or with a profit motive does not fall into the category of debt incurred for 'personal, family, or household purposes.'"). Although some courts have disagreed with this kind of "profit motive" test, this Court is bound by the Fourth Circuit's decisions in *Kestell* and *Runski*. The Court must evaluate the facts of this matter and the meaning of the term consumer debt under section 101(8) based on, among other things, the context of section 707(b) and applicable precedent.

**A. Meaning of Consumer Debt Generally**

The definition of consumer debt was introduced with the enactment of the Code in 1978. 11 U.S.C. § 101(8); *see also In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) (discussing legislative history to definition of consumer debt, which was originally codified as section 101(7) of the Code and subsequently renumbered); *In re Hlavin*, 394 B.R. 441, 445 (Bankr. S.D. Ohio 2008) (same). The language of section 101(8) of the Code is unambiguous, and courts generally employ a plain meaning approach to its application. *See, e.g.*, *In re Kelly*, 841 F.2d 908, 912 (9th Cir. 1988); *In re Lemma*, 393 B.R. 299, 301–302 (Bankr. S.D.N.Y. 2008); *Hlavin*, 394 B.R. at 445; *see also In re Harris*, 203 B.R. 46, 50 (Bankr. E.D. Va. 1994) (following approaches of

*Booth* and *Kelly*). As such, many courts find it unnecessary or improper to consider the statute's legislative history.[6] *See, e.g.*, *Kelly*, 841 F.2d at 912 ("As the Supreme Court has noted, 'legislative history, ... by traditional canons of interpretation[,] is irrelevant to an unambiguous statute.'"); *Lemma*, 393 B.R. at 302 ("The Court declines to look beyond section 101(8), into its legislative history to interpret its meaning, because the statute is unambiguous on its face."). The Court agrees with this approach to statutory interpretation, but observes that the legislative history to sections 101(8) and 707(b) is broader than often acknowledged by courts invoking that legislative history to support a particular interpretation of the Code.[7]

For example, some courts emphasize statements in the legislative history to section 707(b) concerning Congress' objective to mitigate abuses of consumer credit. *See, e.g.*, *In re White*, 49 B.R. 869, 872 (Bankr. W.D. N.C. 1985). These courts then tend to limit the term consumer debt to consumer credit debt. *See id.* The Court acknowledges that perceived abuses of consumer credit motivated several of the 1984 amendments to the Code. Nevertheless, the legislative history also indicates a more general Congressional concern regarding the increase in

---

[6] The role of legislative history in the context of section 101(8) arises frequently in cases involving home mortgages. *See, e.g.*, *In re Swenby*, 529 B.R. 705, 708 (Bankr. W.D. Wis. 2015); *In re Bertolami*, 235 B.R. 493, 495 (Bankr. S.D. Fla. 1999). The legislative history from the 1978 hearings on the enactment of the Code includes statements that "'consumer debt does not include a debt to any extent the debt is secured by real property.'" *Bertolami*, 235 B.R. at 495 (quoting 124 Cong.Rec. H11090 (daily ed. Sept. 28, 1978); S17406 (daily ed. Oct. 6, 1978)). The court in *Bertolami* reviews the split in case law concerning the classification of home mortgages as consumer debt and ultimately concludes that "[i]n accordance with the *Kelly* Court's findings and reasoning, this Court will look to the clear and unambiguous language of § 101(8) instead of the Congressional Record Statements of Senator DeConcini and Representative Edwards pertaining thereto. Section 101(8) does not exclude debt secured by real property or a residential mortgage from the definition of consumer debt. Rather, it defines consumer debt as 'debt incurred ... for a personal, family, or household purpose.' This Court interprets § 101(8) to mean ***all debt*** incurred for such purposes, rather than all debt except debt secured by real property." *Id*. at 496 (emphasis in original).

[7] With respect to section 101(8), the United States Court of Appeals for the Fifth Circuit explained that "[t]he legislative history of [section 101(8)] indicates that the definition is adapted from the definition used in various consumer protection laws." *Booth*, 858 F.2d at 1054. This same legislative history, however, demonstrates that Congress used the term "consumer debtor" to mean "individual debtor." For example, the House Report states, "Though this Report is divided between consumer debtors and business debtors, the Bill itself makes no such distinction. The provisions of Chapter 7, Liquidation, for example, apply equally to business and consumer cases." H.R. Rep. 95-595, 6, 1978 U.S.C.C.A.N. 5963, 5968. As such, the term "consumer" does not necessarily refer to an individual's acts or conduct solely as a "consumer" in the marketplace.

personal bankruptcy cases after the enactment of the Code. *See, e.g.*, 130 Cong. Rec. S8891, 8894 (daily ed. June 29, 1984) ("The number of consumer bankruptcy cases filed has risen dramatically each year since the bankruptcy code was last amended in 1978. Several witnesses before the Senate Judiciary Committee pointed to these changes in the Code as the principal cause of the increase. The 1978 amendments generally eased a debtor's access to bankruptcy to avoid excessive indebtedness.") (Sen. Hatch). The Court offers no opinion on the policy objectives in either section 101(8) or 707(b) of the Code. It references the legislative history to section 707(b) only to highlight that the arguably broader approach to the definition of consumer debt suggested by the Fourth Circuit in *Kestell* and *Runski* (and some courts in other jurisdictions) is not inconsistent with the legislative history.

Nevertheless, as suggested above, the Court finds no need to rely on legislative history and focuses solely on the language of the statute itself. Indeed, a review of the relevant terms used in the definition of consumer debt quickly clarifies its scope. The Code defines the term consumer debt as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). The Code, in turn, defines the term "debt" as a "liability on a claim," and the term "claim" to include "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §§ 101(5), (12). In addition, courts have interpreted the term "incur" to mean "to become liable to or to bring it down on oneself"; the term "primarily" to mean "of the first importance or … fundamental"; and the term "purpose" to mean "an intention or an object set before oneself as an aim." *White*, 49 B.R. at 872; *see also West*, 2017 WL 746250, at *10 (defining "incur" to mean "'to suffer or to bring on oneself'") (internal citations omitted); *In re Grillot*, 2017 WL 4286882, at *4 (Bankr. D. Kan. Sept. 22, 2017) (defining "purpose" to mean "'that which one sets before him to accomplish; an

end, intention, or aim, object, plan, project'") (internal citations omitted). The core of the consumer debt definition thus concerns debt that an individual debtor undertakes to serve her private affairs.[8]

**B. Application of Consumer Debt Definition**

In this matter, the Debtor chose to use the Inheritance Funds "for his own purposes," as explained by the State Court. State Court Tr. 39. Whether that entailed purchasing a motorcycle or paying for vacations, the Debtor made a decision to use money that was not his to obtain personal or family goods or aims. Moreover, as admitted by the Debtor in the context of the Motion for Partial Summary Judgment, "[e]ach expenditure of the Inherited Money that Debtor made was made primarily for a personal, family, or household purpose." Order at 2, ECF 30.

Notwithstanding these facts, the Debtor argues that the real "debt" is the State Court Judgment and that such judgment is a non-consumer debt. The Debtor's argument has some merit, particularly with respect to the Punitive Damages. A punitive damages award by its very nature does not serve a personal, family, or household purpose (at least from the debtor's perspective), and is akin to a penalty. The Debtor's argument has significantly less force with respect to the Actual Damages and the Non-Economic Damages. The Court addresses each component of the State Court Judgment below.

**1. Actual Damages**

The Actual Damages relate to the Debtor's use of the Inheritance Funds for his own, personal purposes. Notably, the Creditor had a "claim" against the Debtor for the repayment of

[8] Some courts require a debtor's act to be voluntary or of her own volition in order to classify the resulting debt as a consumer debt. *See, e.g.*, *West*, 2017 WL 746250 at *10. As explained below, the Court finds that the Debtor made a decision—of his own volition—to use the Inheritance Funds for his own purposes. Moreover, the Court's decision regarding the classification of the Punitive Damages is based on the purpose of that award, and not the fact that a court judgment might be viewed as involuntary. Thus, the Court does not address whether an involuntary judgment that satisfies the purpose element of section 101(8) of the Code may nonetheless qualify as a consumer debt because, for example, the debtor brought the liability on herself—i.e., "incurred" the debt. The Fourth Circuit's decision in *Kestell* would suggest, however, such a result.

those funds even before the entry of the State Court Judgment. That claim arose upon the Debtor's decision to use the Inheritance Funds—a decision made of his volition—for his own purposes. The Court agrees with the U.S. Trustee that this repayment obligation is similar to that arising when a debtor borrows money from a bank or a friend and uses the money to purchase personal, family, or household goods. In both scenarios, the debtor must repay the money (unless the parties agree otherwise). The fact that the debtor is directed to repay the money by a court order rather than a private contract does not change the "purpose" underlying the claim on which the debtor has liability.[9]

"Courts determine the debtor's purpose as of the time the debt was incurred." *In re Cherrett*, 873 F.3d 1060, 1067 (9th Cir. 2017). The Debtor's purpose in using the Inheritance Funds was personal and for his own benefit. He is deemed to have conceded this point in the Request for Admissions; and the State Court reached this same conclusion. *See* State Court Tr. 39. Although the State Court Judgment memorializes and enforces the Creditor's claim against the Debtor for the Inheritance Money, the claim itself arose well before the State Court litigation. The point in time at which the Debtor used the money (and the Creditor's right to repayment arose) governs the determination of the debt's purpose under section 101(8) of the Code.

The facts supporting the characterization of the Actual Damages as a consumer debt are very different from those leading courts to determine that a debt is non-consumer, but not a business debt. Courts commonly refer to these kinds of debts as "interstitial." *See, e.g.*, *West*, 2017 WL 746250, at *10; *Grillot*, 2017 WL 4286882, at *4; *In re Peterson*, 524 B.R. 808, 813

---

[9] At the Hearing, the U.S. Trustee posited that litigation over a debtor's nonpayment of credit card debt would not change the classification of the debt as consumer debt if the underlying use of the credit card and resulting charges involved a personal, family, or household purpose. The Court agrees. The debtor's use of the funds—regardless of how the resulting debt ultimately is enforced—should inform a court's analysis of whether the debt was "incurred for a personal, family, or household purpose" under section 101(8) of the Code.

(Bankr. S.D. Ind. 2015); *White*, 49 B.R. at 872. Debts falling into this category include tax claims (characterized as involuntary with a purpose to benefit the public) and some tort claims (frequently automobile accidents in which the resulting debt is characterized as involuntary with a purpose to compensate the victim). Similarly, in *West*, the court (after finding a profit motive and in the alternative) determined that the debt at issue arose from the creditors' motion for discovery sanctions against the debtor, which was involuntary and not incurred for the debtor's aims. *See West*, 2017 WL 746250, at *10. This case is different, and the Court concludes that the portion of the State Court Judgment relating to the Actual Damages is a consumer debt under section 101(8) of the Code.

**2. Punitive Damages**

The portion of the State Court Judgment awarding the Punitive Damages looks more like the kinds of debts deemed interstitial by courts and treated as non-consumer under section 101(8) of the Code. The Court must, however, consider the directive of *Kestell* and *Runski* and whether the non-profit aspect of the Punitive Damages classifies even this portion of the debt as consumer debt. *Kestell* involved a lump-sum amount that the debtor owed to his former wife under a divorce judgment. The Fourth Circuit's characterization of the judgment at issue in *Kestell* is clear and succinct: "Since this debt was not incurred with a profit motive or in connection with a business transaction, it is considered 'consumer debt' for purposes of section 707." 99 F.3d at 149. The Fourth Circuit did not, however, necessarily rule out a possible third category of interstitial debt.[10]

[10] The Court acknowledges that the debate concerning whether consumer debt is only one subset of non-business debt or, rather, the only alternative to business debt was contemplated by courts prior to the Fourth Circuit's decision in *Kestell*. *See, e.g.*, *White*, 49 B.R. at 872. Nevertheless, the Fourth Circuit did not address this debate directly in either the *Kestell* or *Runski* decision, and the Fourth Circuit's holding in each case was based on the facts before it. Accordingly, as explained below, the Court considers, and is guided by, *Kestell* and *Runski* based on the facts of this matter.

At least one lower court in this Circuit has suggested that the Fourth Circuit's holding in *Kestell* did not contemplate certain kinds of involuntary debts, such as tax debt. *See In re Stovall*, 209 B.R. 849 (Bankr. E.D. Va. 1997). In *Stovall*, the court acknowledged the dichotomy between consumer debt and business debt articulated by the Fourth Circuit in *Kestell* and *Runski*, but concluded that the personal property tax debt before it was not a consumer debt in light of the purpose of the debt. *Id.* at 854 (noting that "the opinions in *Runski* and *Kestell* look to the *purpose* of the transaction giving rise to the debt") (emphasis in original). The court explained, "A tax, however, is not 'incurred,' but rather, is involuntarily imposed by a government for the public welfare. Such public purpose is sufficient, in the court's view, to take the debt outside the scope of a consumer debt. In this connection, the court notes that a tax is not the only kind of liability that falls into this 'interstitial' area of debts that are not consumer debts, but yet are not business debts." *Id.*

Although the Court generally agrees with the court's analysis in *Stovall,* the debt before the Court is closer in kind to the debt in *Kestell*—both debts involved state court judgments that arguably could serve a personal, family, or household purpose and arguably could be classified as involuntary. The *Kestell* decision does not provide much information about the divorce judgment, other than that "[t]he divorce judgment required Kestell to pay Atkinson alimony, support for three of the couple's five children, a lump-sum award, attorney's fees, and a share of profits from a rental property." *Kestell*, 99 F.3d at 147. One potential difference between the divorce judgment in *Kestell* and the State Court Judgment is the penalty nature of the Punitive Damages. The Court thus must evaluate the purpose of the Punitive Damages, as mandated by the language of section 101(8) and the Fourth Circuit's guidance in *Kestell* and *Runski*. *See, e.g.*, *Runski*, 102 F.3d at 747 ("In determining whether debt is for 'personal, family, or household

purposes' under § 101(8), courts look to the purpose for which the debt was incurred.") (citing *Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir.1988)); *Kestell*, 99 F.3d at 149.[11]

The Court does not know for certain the purpose of the lump sum payment under the divorce judgment in *Kestell*, but such a judgment could serve a "personal, family, or household purpose" to the extent it provided support for the debtor's children or former spouse (or, for example, helped to repay household debt). That is very different from the purpose underlying a punitive damages award. Courts historically have awarded punitive damages to punish the defendant and to deter the defendant and others from committing similar conduct in the future. *See, e.g.*, *Beverly v. Vitran Exp., Inc.*, 2012 WL 3772579, at *3 (D. Md. Aug. 28, 2012) (explaining that Maryland law seeks to further "the historical purposes of punitive damages—punishment and deterrence") (citation omitted). The punishment and deterrence objectives of a punitive damages award are often necessary and very appropriate under applicable law, but differ in significant ways from a "personal, family, or household purpose." Like the tax debt in *Stovall* and the sanctions debt in *West*, the Court finds that the Punitive Damages do not meet the definition of consumer debt in section 101(8) of the Code.

**3. Non-Economic Damages**

Finally, with respect the Non-Economic Damages, the Court finds that the purpose of this portion of the State Court Judgment is akin to interest charged on a loan. The interest component of a loan compensates the creditor for the debtor's use of the funds and, as such, is tied directly

---

[11] The Fourth Circuit is not as direct on the purpose aspect of section 101(8) of the Code in *Kestell*, but the Court notes that *Runski* was decided after *Kestell* and that two of the three members of the panel were the same in both cases. The Fourth Circuit's language in *Runski* also suggests that not all non-business debt is consumer debt in that the Fourth Circuit stated that "business debt" is not consumer debt, thus focusing on the precise language of section 101(8) and what kinds of debt fall within that definition. Moreover, although *Runski* involved the use of the term consumer debt in section 722 of the Code, as the Fourth Circuit explained, "[b]ecause the rules of statutory construction require us to presume that these terms have the same meaning throughout the same act, … we turn to cases construing the language of § 101(8) for aid in determining the proper meaning of the nearly identical language found in § 722." *Runski*, 102 F.3d at 746–47.

to the purpose served by the debtor's use of those funds. In awarding the Non-Economic Damages, the State Court stated, "So for me, I look at a seven-year period from which you became aware that you were being denied access to the money and be[ing] given this bogus response. So I'm awarding at a rate of $10,000 a year for seven years, so non-economic damages in the amount of $70,000." State Court Tr. 39. Based on the entirety of the record in this matter, the Court finds that the Non-Economic Damages are compensation for the Debtor's use of the Inheritance Funds for a personal, family, or household purpose and constitute consumer debt under section 101(8) of the Code.

## IV. Conclusion

For the reasons set forth above, the Court concludes that the Actual Damages and the Non-Economic Damages qualify as consumer debt under sections 101(8) and 707(b) of the Code. The Court further concludes that the Punitive Damages, though not for a profit motive or associated with a business transaction, do not serve a "personal, family, or household purpose" and, consequently, do not qualify as consumer debt. The Court does not determine herein whether these findings require the dismissal or, with the Debtors' consent, conversion of the Debtors' chapter 7 case under section 707(b). This Memorandum Opinion addresses only the issue posed by the Motion for Partial Summary Judgment. The Court will enter a separate order consistent with, and granting the relief set forth in, this Memorandum Opinion.

**Copies to:** Debtors
Debtors' Counsel
United States Trustee
Chapter 7 Trustee
Damon Durant Jr.'s Counsel

**END OF MEMORANDUM OPINION**